UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUFTHANSA TECHNIK AG,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>THALES AVIONICS, INC.,<br><br>　　　　　Respondent. | Case No.  8:22-mc-00034-JVS-KES<br><br>REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |

This Report and Recommendation ("R&R") is submitted to the Honorable James V. Selna, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.

## I.

## INTRODUCTION

On December 30, 2022, Petitioner LUFTHANSA TECHNIK AG ("Lufthansa") applied for an order under 28 U.S.C. § 1782 authorizing its attorneys to issue a third-party subpoena pursuant to Federal Rule of Civil Procedure 45 on Respondent THALES AVIONICS, INC. ("Thales") to produce documents and to

1

provide testimony for use in pending patent infringement litigation in Germany and the United Kingdom ("UK") against ASTRONICS ADVANCED ELECTRONIC SYSTEMS ("AES"). (Dkt. 1, the "Application.") The European lawsuits allege that AES infringed Lufthansa's European Patent No. EP 881 145 B1 by selling 110-volt in-seat power systems for use in commercial aircraft. Some of AES's power systems were sold to Thales for incorporation into Thales's in-flight entertainment ("IFE") units that Thales then sold to airlines worldwide. (Dkt. 1 at 1-2.[1])

AES intervened, and the parties stipulated to a briefing schedule. (Dkt. 18, 19, and 23.) Following that schedule, Thales and AES opposed the Application. (Dkt. 21, 22.) Lufthansa replied to both oppositions. (Dkt. 28, 29.) The Magistrate Judge conducted a hearing on March 7, 2023. (Dkt. 37, Dkt. 39 (transcript).)

For the reasons discussed below, the undersigned Magistrate Judge recommends that the Application be DENIED.

## II.
## LEGAL STANDARD

28 U.S.C. § 1782 authorizes this Court to order any person in the Central District of California to give testimony and produce documents for use in a foreign proceeding upon the application of any person with an interest in that proceeding. Specifically, § 1782(a) provides in pertinent part:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made … upon the

---

[1] Page cites refer to the pagination imposed by the Court's e-filing system.

2

application of any interested person and … [t]o the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

28 U.S.C. § 1782(a).

To obtain discovery in aid of foreign litigation, a petitioner must show that: (a) the person to provide discovery resides or is found in the district where the application is made; (b) the information sought is "for use in a proceeding in a foreign or international tribunal"; and (c) the petitioner is an "interested person" in the foreign proceeding.  28 U.S.C. § 1782(a); Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 246 (2004).

Upon finding the three statutory factors satisfied, the district court still has discretion to deny the requested discovery.  Intel Corp., 542 U.S. at 264.  In exercising this discretion, caselaw suggests four non-exclusive factors for consideration: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding" such that the "foreign tribunal has jurisdiction over [it]"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the requests are "unduly intrusive or burdensome."  Intel Corp., 542 U.S. at 264-65; see also United States v. Global Fishing, Inc. (In re Premises Located at 840 140th Ave. NE, Bellevue), 634 F.3d 557, 563 (9th Cir. 2011).

### III.
### FACTUAL BACKGROUND

**A. Lufthansa's First § 1782 Application.**

In June 2019, Lufthansa initiated a 28 U.S.C. § 1782 action in the Central

3

District of California for discovery in aid of foreign proceedings in France, Germany, and the UK, and contemplated proceedings in Japan and Spain. These foreign proceedings involved allegations of patent infringement for the same patent and the same 100-volt in-seat power system. (See In Re the Application of Lufthansa Technik AG, Petitioner, for an Order Pursuant to 28 U.S.C. 1782, No. 8:19-mc-00016-JVS-KES (the "2019 Case"), Dkt. 1.) Before the 2019 Case began, "Lufthansa's patent had already been held *valid and infringed* in Germany, entitling Lufthansa to damages from Thales' supplier, [AES], dating back to December 2003." (2019 Case, Dkt. 100 at 3.) While the 2019 Case was pending, in "June 2020, the UK court found Lufthansa's patent *valid and infringed*, entitling Lufthansa to damages" from AES from as early as December 2011. (Id. at 3-4.)

The proposed 2019 subpoena to Thales sought twelve categories of documents to assist Lufthansa in proving its damages. For the relevant years, Lufthansa sought records reflecting all Thales's purchases of AES's "110V in-seat power systems or parts thereof" for eventual installation in German and UK aircraft along with numerous data points about those purchases, including part numbers, dates received, prices paid, invoice numbers, ship-to addresses, aircraft in which the parts were installed, repairs, returns, statements of work, etc.[2] (2019 Case, Dkt. 1-4 (2019 subpoena).) It also asked for the contracts between Thales and AES and documents showing that AES knew where its 100-volt in-power seat systems would eventually be installed. (Id.)

The Court granted the 2019 application, allowing Lufthansa to serve the

---

[2] The 2019 subpoena defined the term "110V In-Seat Power Systems" as all the components of the system for supplying 110-volt power in the passenger cabin of an aircraft, including "outlet sockets, power supplies, master control units, electronic controls such as in-seat power supplies or seat power boxes and other electronic parts, connections, and/or spare parts," that were "offered, imported, owned, sold, or brought into circulation by AES." (2019 Case, Dkt. 1-4 at 4.) This definition excludes components made by Thales.

subpoena on Thales. The Court, however, noted, "If Thales or any other appropriate party serves objections or moves to quash or modify the subpoena, then the Court will hold a hearing as warranted." (Id., Dkt. 11 at 6.) The Court granted AES's motion to intervene, set a hearing on Thales's motion for reconsideration, and instructed the parties to meet and confer about narrowing the document requests. (Id., Dkt. 34, 38 at 32-33 ("The Court is not inclined to go an all-or-nothing path. It does seem pretty clear … that Thales has relevant information and that Lufthansa is entitled to discover it. It's a matter of trying to figure out … how to do that without creating unnecessary burdens.").)

Between August 2019 and August 2020, the parties filed numerous status reports and conducted conferences with the Court describing their discovery efforts. Thales provided, among other discovery, several iterations of extensive spreadsheet-style reports with many of the data points requested by Lufthansa, including details for thousands of sale transactions. Thales also provided testimony explaining the reports in three depositions and multiple declarations. (Dkt. 21-3 (2019 Case motion describing Thales's discovery responses).)

During the 2019 Case, one complexity discussed was that Thales did not buy in-seat power systems from AES and simply pass them on to Thales's aircraft customers using one AES part number. Rather, the AES power systems comprised multiple AES components then incorporated into assemblies, such as IFE units, made and sold by Thales. As explained by counsel for Thales at a 2019 discovery conference:

> It becomes increasingly difficult with the more [AES] parts that are involved …. What happens, is ***we have to look at each AES part and then individually track in the system into which Thales Avionics assemblies, or sub-assemblies, it might be incorporated***. And only then after building out the list, and there are, I'm told there are thousands of Avionics sub-assemblies and assemblies. And only

       after that search is concluded can we then actually start doing the
       aggregation regarding the prices paid to [Thales] for our assemblies
       and sub-assemblies in Germany

(Dkt. 21-5 (9/27/19 transcript) at 12:4-19 (emphasis added).) In a September 2019 declaration, Thales employee Kam Mohager explained, "Thales purchases parts from many vendors, including [AES] to be incorporated into Thales's IFEs. Among other things, Thales purchases AES's Outlet Units, ISPS, Seat Power Boxes and harnesses for both AC and DC systems." (2019 Case, Dkt. 110-3 at ¶ 4.) Indeed, one topic about which Lufthansa sought deposition testimony in the 2019 Case was Thales's "sales practices and procedures for selling 110V In-Seat Power Systems *or Thales Avionics's assemblies incorporating 110V In-Seat Power Systems* delivered to or installed in the United Kingdom, France, or Germany." (Dkt. 21-3 at 42, topic 5 (emphasis added).)

      The 2019 Case culminated when Lufthansa moved to compel full compliance with the subpoena and obtain additional deposition testimony from Thales. Consistent with the Court's Local Rules, the motion was filed in the form of a joint stipulation, in which Thales asked for a protective order excusing full compliance. (Dkt. 21-3; see also 2019 Case, Dkt. 100.) The Magistrate Judge granted the motion to compel in part and denied it in part, directing Thales to provide additional sales information via spreadsheet for Northern Ireland, because those sales related to Lufthansa's damages calculations in the UK litigation. (2019 Case, Dkt. 107.) In that Order, the Magistrate Judge summarized Thales's provision of discovery over the preceding year and the parties' representations and agreements that Thales would prepare and produce spreadsheets (which Thales did) in lieu of producing all documents responsive to the 2019 subpoena. (Id.)

      Lufthansa moved for review of the Magistrate Judge's Order, which the District Court denied. (Id., Dkt. 122.) Lufthansa then appealed the decision to the Ninth Circuit, which affirmed it in a memorandum opinion. (Id., Dkt. 129 (case

6

no. 20-56293).)  Mandate issued on February 11, 2022.  (2019 Case, Dkt. 130.)

### B. The Instant Application.

On February 8, 2022, AES wrote to Thales requesting information in connection with the German litigation.  (Dkt. 1 at 53.)  Thales responded in a letter dated June 1, 2022.  (Id. (the "June 2022 Letter")).  The June 2022 Letter transmitted a spreadsheet with information from August 1, 2005, through May 22, 2018, that Thales described as follows:

> Accompanying this letter is an Excel spreadsheet, Appendix 1, containing the responsive information using the [AES] parts attached as Annex 1a to your February 8 correspondence.  Consistent with our understanding of the request, we have included information for those ***Thales assemblies that incorporate one or more of the AES parts listed on Annex 1a.***  As a result, the spreadsheet includes two worksheets.  The first worksheet, astronics_parts_shipment, lists responsive shipments of parts listed on Annex 1a.  The second worksheet, astronics_component_shipment, lists responsive shipments of Thales Components that incorporate one or more of the parts listed on Annex 1a.

(Id.)

Lufthansa contends that upon seeing this letter, it realized for the first time "that Thales Components are integrated with AES Components."  (Dkt. 1 at 4.)  Lufthansa contends that it instituted the instant Application because of this new information.[3]  (Id. at 2 ("This present action pertains to new information Thales

---

[3] At the hearing, Lufthansa explained the "new" information learned from the June 2022 Letter as follows: "When our German colleagues looked at the attachments, they saw parts that … had not been produced in the prior 2019 discovery.  They compared it to the 2019 parts that had been produced, and they saw a number of parts [footnote continued … ]

disclosed in a letter to AES in June 2022 …. The letter indicates that Thales supplied components to its downstream customers that were incorporated with AES Components, resulting in an infringing system referred to as an 'In-Seat-Power-System,'" a system distinct from Thales's IFE units.).)

When Thales appeared, it filed a Notice of Related Case identifying this action as related to the 2019 Case. (Dkt. 11.) Lufthansa objected that the two cases are "materially different." (Dkt. 13 at 2.) According to Lufthansa, the 2019 Case sought information about "components manufactured or supplied" by AES to Thales, whereas this instant action "seeks information related to components manufactured or supplied by Thales …, e.g., cables, seat electronic boxes, termination caps etc. manufactured by Thales itself." (Id.) The Court determined that the cases are related and transferred the instant action to the same judges who presided over the 2019 Case. (Dkt. 14.)

Through the Application, Lufthansa seeks to subpoena documents from Thales responsive to eight topics. (Dkt. 1 at 59-65 (the "Proposed Subpoena").) The covered time period for German-related documents is about fifteen years (i.e., December 26, 2003 to May 2, 2018) and for UK-related documents, about eleven years (i.e., December 1, 2011 to May 22, 2022). (Id. at 63.) The Proposed Subpoena's eight topics are summarized as follows:

(1) <u>Topic One – Part Numbers</u>: All part numbers (and corresponding part descriptions) used by Thales, AES, and Thales' airline customers for all components of In-Seat Power-Systems. An "In-Seat Power-System" is defined as a system containing "one or more AES Component." An "AES Component," in turn, is defined as a 110-volt power supply system licensed for use in the passenger

---

that weren't there." (Dkt. 39 at 71.) They believed some of those Thales parts were cables connecting the AES power box to the seat or connecting the AES power box to the IFE. (Id.)

cabin of an aircraft that makes use of features claimed by the relevant Lufthansa patent, ***and everything sold with it*** or later modifying it.  (Dkt. 1 at 62-63 (emphasis added).)  Based on these definitions, "In-Seat Power-Systems" would include all the AES parts that were the subject of the 2019 subpoena plus any Thales-made parts sold with the power system, such as connecting cables or the components of Thales's IFE units.

  (2) <u>Topic Two – Shipping Documents</u>: Shipping documents for every "Shipment" during the covered time periods including shipping instructions and other data points about each shipment.  A "Shipment" is defined as every sale of an In-Seat Power-System "or parts thereof" to a location in Germany or the UK, or to any other location but intended for installation in an aircraft that would be finally assembled in Germany or the UK.  (<u>Id.</u> at 62-64.)  Again, because of the broad definition of "In-Seat Power-System," topic two is as broad as topic one.

  (3) <u>Topic Three - Purchase Documents</u>: Documents, such as purchase orders and invoices, sufficient to show approximately thirty data points for each Shipment, including the order date, shipping date, customer, price, part number, batch number, etc.  (<u>Id.</u> at 64.)

  (4) <u>Topic Four – Modification Level/Batch Number</u>: The modification level and batch number "for each purchase or receipt of an In-Seat Power-System or part thereof that was subsequently sold or shipped according to Request no. 2 by Thales."  (<u>Id.</u>)

  (5) <u>Topic Five – More Purchase Documents</u>: Documents, such as purchase orders and invoices, sufficient to show approximately twenty data points "for each purchase or receipt of an In-Seat Power-System or part thereof that was subsequently sold or shipped according to Request no. 3 by Thales."  (<u>Id.</u>)

  (6) <u>Topic Six – Incorporation Documents</u>: Technical documents, such as maintenance manuals, data sheets, and equipment specifications, "sufficient to show how the components of an In-Seat-Power-System pursuant to Request no. 2

can be incorporated in the In-Seat-Power-System." (Id.)

(7) <u>Topic Seven – Manufacturing Documents</u>: Manufacturing records, such as design reviews, inspection minutes, plans, and delivery schedules, sufficient to show the installation in Germany or the UK of each In-Seat Power-System identified in response to Request no. 2. (<u>Id.</u>)

(8) <u>Topic Eight – Communications</u>: Documents "sufficient to show AES's interaction with Thales concerning the installation of the In-Seat-Power-System in Germany and/or the UK." (<u>Id.</u> at 64-65.) This appears to encompass the same contracts and communications reflecting AES's "knowledge" that were subpoenaed in 2019. (<u>Compare</u>, 2019 Case, Dkt. 1-4 at 6-7, topics 6, 10, and 11.)

## IV.
## DISCUSSION

### A. Res Judicata.

Thales argues that the Application is barred by res judicata arising from the Court's denial of Lufthansa's motion to compel compliance with the 2019 subpoena. (Dkt. 21 at 8.)

**1. Legal Elements.**

"When considering the effect of a prior federal court judgment, the Court applies the federal law of res judicata." <u>Bak v. Donahoe</u>, No. SA CV 14-1007-JVS-E, 2015 U.S. Dist. LEXIS 45540, at *8 (C.D. Cal. Mar. 10, 2015) (citing <u>First Pac. Bancorp, Inc. v. Helfer</u>, 224 F.3d 1117, 1128 (9th Cir. 2000)), <u>report and recommendation adopted</u>, No. SA CV 14-1007-JVS -E, 2015 U.S. Dist. LEXIS 45545 (C.D. Cal. Apr. 7, 2015).

The "goals of res judicata" are "fairness, finality, and avoidance of duplicate judicial proceedings." <u>United States v. Liquidators of Eur. Fed. Credit Bank</u>, 630 F.3d 1139, 1152 (9th Cir. 2011). Res judicata applies "whenever there is (1) an identity of claims, (2) a final judgment on the merits, and (3) identity or privity between parties." <u>Owens v. Kaiser Found. Health Plan, Inc.</u>, 244 F.3d 708, 713

(9th Cir. 2001) (citation and internal quotations omitted). When res judicata applies, it bars "litigation in a subsequent action of any claims that were raised or could have been raised in the prior action." Id.

**2. Analysis.**

Thales has cited no case applying res judicata in the context of a § 1782 application. Discovery commonly unfolds in stages. One subpoena may yield information that reveals the need for a second subpoena. The Court's order refusing to compel Thales's further compliance with the 2019 subpoena, therefore, was not a "final order" that cut off all future discovery requests if Lufthansa could have made them in the 2019 Case. Rather than applying the doctrine of res judicata, the Court considers the degree of overlap between the two subpoenas in conducting its discretionary analysis below.

**B. § 1782's Three Factors.**

The parties do not dispute that two of the three factors are satisfied. Thales resides in the Central District of California, and Lufthansa is an interested party in the Germany and UK litigation. The parties dispute, however, whether the requested information is really "for use" in those European lawsuits.

Lufthansa contends that the "for use" statutory factor does not constitute a requirement that the proposed discovery be relevant. (Dkt. 29 at 7-8.) Other courts have determined that a "request for discovery under § 1782 that is plainly irrelevant to the foreign proceeding will fail to meet the statutory 'for use' requirement[.]" In re Schlich, 893 F.3d 40, 52 (1st Cir. 2018); see also Mees v. Buiter, 793 F.3d 291, 299 (2d Cir. 2015) (A "request that fails to show that the materials sought will be of any use in the foreign proceeding would not satisfy the 'for use' requirement.").

**1. Use in the German Litigation.**

Thales contends that the information it provided during the 2019 Case along with the information attached to the June 2022 Letter suffices to enable Lufthansa

11

to prove its German damages, making the Proposed Subpoena unnecessary. (Dkt. 21 at 12-13, 17.) Lufthansa counters by representing that it seeks some documents that were not subpoenaed in the 2019 Case. Lufthansa further contends that the information provided with Thales's June 2022 Letter is incomplete, because the list of AES parts from which Thales worked, i.e., Annex 1a, was later replaced by Annex 1e. (Dkt. 1 at ¶ 16; Dkt. 28 at 5.)

The Court finds that the German-related documents are sought to prove Lufthansa's damages in the German litigation. The Court considers the extent of the overlap between the 2019 subpoena and the Proposed Subpoena in its discretionary analysis below.

**2. Use in the UK Litigation.**

Whether the Proposed Subpoena seeks documents "for use" in the UK litigation is a closer call. Initially, Lufthansa represented that the UK-related documents were also needed "to submit evidence and accountings for damages based on sales by AES and its customers." (Dkt. 1 at 2.)

AES opposed the Application with the following expert testimony:
> [U]nder U.K. law, information about Thales components of an IFE system and the extent to which they are integrated with AES components and sold into the U.K. are totally irrelevant to Lufthansa's potential damages. This is because Thales—unlike AES, PAC, and Safran—is not a party to the U.K. proceedings. It is black-letter U.K. law that a claimant cannot assert a claim based on sales of infringing components made by a third-party (such as Thales) unless that claim is specifically pleaded. Lufthansa pleads no claim against Thales.

(Dkt. 22 at 12 (citing Dkt. 22-2 ("Bennett Decl.") at ¶¶ 10-12).)[4]

---

[4] Mr. Bennett is an English [footnote continued … ]

In response, Lufthansa offered two alternative ways that the Thales documents might be used in the UK litigation. First, the information "might reveal whether Lufthansa has a basis to sue Thales" in the UK. (Dkt. 29 at 12.) Second, the information "may provide a helpful 'double-check' on … the information AES provides through the disclosure procedure in the UK proceedings." (Id.) Lufthansa cites the declaration of Alastair McCulloch, its counsel in the UK proceedings, who acknowledges (without refuting) Mr. Bennett's declaration about the UK's black-letter damages law. (Dkt. 31 at ¶¶ 5-6.)

Based on this case's unique facts, the Court rejects the argument that the Proposed Subpoena would seek information "for use" in the UK proceedings if it only potentially helped Lufthansa decide whether to sue Thales in the UK. The UK litigation has been pending for years and AES's role as a supplier to Thales has been known for years. Lufthansa has not explained why the information it seeks in the Proposed Subpoena, as opposed to the extensive information it already it already received from Thales about IFE sales, would sway this decision. In the 2019 Case, Thales noted that Lufthansa had already threatened to sue Thales in the UK, but even then, Thales viewed that threat as "increasingly unrealistic" due to "the reality of the various statutes of limitations, of repose, and of similar mechanisms." (2019 Case, Dkt. 100 at 38 (citing Dkt. 100-5 ("Morris Decl.")).)

To the extent Lufthansa wants third-party discovery under § 1782 to "double-check" the completeness of AES's UK discovery, Lufthansa has articulated a use, but not a particularly compelling one. In its discretionary analysis below, the Court concludes that Lufthansa's desire to do "double-check" discovery does not justify imposing such discovery on third party Thales.

---

patent litigator who represents AES in the UK proceedings. (Dkt. 22-2 at ¶¶ 1-2.)

13

### C. Analysis of Discretionary Factors.

### 1. Whether Discovery is Sought from a Participant in the Foreign Proceedings.

If the person from whom discovery is sought is a participant in the foreign proceedings, then the need for § 1782 aid is not as readily apparent. Intel Corp., 542 U.S. at 264. In that instance, the foreign tribunal would have jurisdiction over those appearing before it and could itself order them to produce evidence. Id.

Thales is not a party to the UK or German proceedings. Thales has, however, already provided extensive information intended to aid in the UK and German proceedings in response to the 2019 subpoena. Thales has also continued to provide information voluntarily, such as the information attached to the June 2022 Letter. This factor, therefore, weighs in favor of allowing the discovery, but not strongly so.

### 2. The Nature of the Foreign Tribunal and Character of the Proceedings.

Discovery in aid of foreign proceedings may be denied where it would not serve due process and the interests of justice. See, e.g., In re JSC United Chem. Co. Uralchem, Civ. A. 20-3651, 2020 U.S. Dist. LEXIS 131492, at *19 (D.N.J. July 24, 2020) (declining to authorize discovery in aid of Russian proceedings where the proceedings were "subject to undue governmental influence").

Here, the Court has no reason to doubt that the foreign proceedings comport with notions of fairness and due process.

### 3. Whether the Request Attempts to Circumvent Policies of a Foreign Country or the United States.

#### a. Policy of Avoiding Delays.

The parties' briefing identifies no German policy that would be defeated by authorizing the Proposed Subpoena.

As to UK litigation, however, Thales suggests that authorizing the Proposed

14

Subpoena may circumvent public policies underlying the UK's statute of limitations for patent infringement claims if its purpose is to help Lufthansa decide whether to sue Thales in the UK. Thales argues that Lufthansa's protestations that it only recently discovered that Thales "integrates" AES parts into Thales assemblies are false, since such integration was repeatedly discussed during the 2019 Case, as cited above.

The United States values the "just, speedy, and inexpensive determination" of every action. Fed. R. Civ. P. 1. Undoubtedly, the UK does too. The Court finds that the instant Application, brought many years after the start of the UK litigation, after Thales's response to the 2019 subpoena provided extensive discovery, and after Lufthansa's unsuccessful appeal of the ruling that no further response from Thales would be compelled, does not comport with the policies embodied in Rule 1.

### b. Policy of Avoiding Burdens to Non-Parties.

"A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). Third parties subpoenaed in the United States in aid of foreign litigation should not be less protected from undue burden than those subpoenaed in domestic litigation. Typically, when the same information can be discovered from a party and a non-party, the information should first be sought from the party. Vota v. Hobbs, 343 F.R.D. 71, 95, n.21 (D. Ariz. 2022).

The Court finds that the instant Application inconsistent with these policies to the extent its purpose is to "double check" the accuracy of information already produced by AES, a party to the UK action. While Lufthansa argues that it suspects AES's discovery responses in the UK are incomplete, Lufthansa has not described what mechanisms are available in the UK to compel complete discovery from AES, whether it has availed itself of those mechanisms, and if not, why not.

15

### 4. Whether the Request Is Unduly Burdensome.

Lufthansa contends, "The discovery requests in this Application are narrowly tailored to seek information concerning the Thales Components referred to in Thales's June 1, 2022 letter." (Dkt. 1 at ¶ 44.) But that is simply not true. The Proposed Subpoena refers neither to the June 2022 Letter nor to the parts listed in its attachments. Instead, due to the Proposed Subpoena's defined terms, its document requests are extremely broad and overlap substantially with the information Lufthansa subpoenaed in 2019. For example, topic one relies on the defined term "In-Seat Power-System," which, in turn, relies on the defined term "AES Component." (Dkt. 1 at 62-63.) As a result, the requested part numbers include the components of Thales' IFE units, just like the 2019 subpoena.

At the hearing, when the Court sought to confirm that the part numbers sought in topic one would include products with "one or more AES components but no Thales components," counsel explained that the Proposed Subpoena had been "clarified" by Lufthansa's briefing and only sought "a parts list that has the Thales components that are integrated with the AES components." (Dkt. 39 at 11.) Counsel noted, "we're trying to draft this not to exclude something that's critical, but in doing that, the wording can be very broad, and you have to read all these things together, and then we further clarified it … in the briefs and the declarations to make … more clear what exactly we're seeking." (Id. at 15.) Counsel suggested that even if the Proposed Subpoena, as drafted, sought much of the same information that Lufthansa requested in 2019, Thales could figure out the overlap and exclude it or re-produce it. (Id. at 11 ("[W]e're not asking [Thales] to produce a parts list that either has the Thales components or whatever parts numbers Thales had from the last time or the AES part numbers that they produced the last time"), 41 ("We're not asking them to produce anything that was part of their production in 2019, again, unless it's easier for them to do it.").)

Topic two relies on the defined term "Shipment" which means all sales of

"In-Seat Power-Systems" or "parts thereof." (Dkt. 1 at 62-64.) If, for example, Thales made a product (like a power cord, connecting cable, bolt, etc.) that it sold with its IFE units (which include AES's infringing power system), the inclusion of that product in an order would bring the order within the definition of "Shipment." This would broaden the Proposed Subpoena's scope to sales of Thales assemblies unrelated to AES's power system but that include such a product. And because the subsequent topics refer to topics one and two, if topics one and two are overbroad, then the entire Proposed Subpoena is overbroad.

At the hearing, Lufthansa represented, "We're only looking for the Thales components that were incorporated[5] into that [AES] power box, into that power system." (Dkt. 39 at 17.) When the Court asked, "What kind of components are we talking about? I mean, did [Thales] put chips in it [i.e., the AES power box]?" (Id.) Counsel responded that Lufthansa "honestly [didn't] know," but there were "some cables" and other part numbers identified as "assemblies" which suggested incorporation. (Id. at 17-18.)

Counsel for Thales denied that Thales incorporates any of its own components into AES power supplies. (Id. at 53 ("[T]here's no Thales components within the AES power supply.").) Counsel endorsed that Thales made items like power cords and connecting cables "that connected to the [AES] power systems but didn't integrate [anything] into or materially change the power systems." (Id. at 54.) Counsel for AES agreed. (Id. at 61 ("Thales components are not part of the AES EmPower in-seat power supply system"), 64-65 ("[T]his

---

[5] By using the word "incorporated" or "integrated," counsel meant two possible scenarios: (1) Thales would purchase an AES power supply, integrate a Thales part into it, then sell the assembly to a Thales customer; or (2) AES and Thales would both ship their own components to a company that manufactures airplane seats, and that manufacturer would integrate the Thales part into the AES power supply. (Dkt. 39 at 43-44.)

17

notion that there are Thales components … that are part of the AES in-seat power supply system is just a fundamental disconnect and simply not correct.").) Counsel pointed out that Thales could not modify AES's power supply box because doing so "would create significant issues about the part being certified … for use" in an aircraft. (Id. at 62, 68.)

After these arguments, when asked for an example of a Thales component integrated into the AES power box, counsel cited the Thales power cable that connects the AES power box to the Thales IFE, but he had no other examples, saying that Lufthansa needed the documents sought by the Proposed Subpoena to learn whether other integration occurs. (Id. at 76-77.) Counsel acknowledged that "determining what is really part of the infringing [AES 110-volt power] system [and thus relevant to damages] versus the IFE exclusively is a bit of a challenge," but that no needed had to make that determination, presumably because the Proposed Subpoena asks for both. (Id. at 84.) Lufthansa suggested that it needed deposition testimony from "somebody who knows these systems inside and out … [to] really try to figure it out" and could then use that new understanding to negotiate a narrower scope for the Proposed Subpoena. (Id.)

All this leads the Court to find that the Proposed Subpoena is overbroad. While Lufthansa represents that it only wants information about Thales's components integrated into the AES power system, (1) that is not what the Proposed Subpoena says; and (2) no one is aware of any such Thales components other than potentially some connecting cords and cables, part numbers already identified in Thales's June 2022 Letter.

Lufthansa argues that if its Proposed Subpoena is objectionably overbroad, then either (1) the Court should re-write it; or (2) the Court should grant the Application and trust Lufthansa to negotiate reasonable limitations. (Dkt. 1 at ¶¶ 47-48.) As to the first option, the Court declines to do so. The Court has limited resources and is not well-suited to wordsmith document requests in foreign

litigation.  This is particularly true when, as discussed above, Lufthansa admits that the Proposed Subpoena needs to be clarified and narrowed.  If Lufthansa is truly only interested in sales information for a handful of Thales's cords and cables, then it can draft a subpoena that says so clearly.

As to the second option, the Court tried that approach in 2019 and observed that it did not work, culminating in Lufthansa's motion to compel full compliance with the 2019 subpoena as if an entire year of negotiations and discovery conferences had never occurred.  As emblematic of the complaints about Lufthansa's inflexibility voiced by opposing counsel in the 2019 Case, in August 2020, Mr. Morris declared:

> During the very first of those meet and confer sessions, I noted that Request 12 [in the 2019 subpoena] appeared entirely duplicative of Request 9.  Counsel for Lufthansa admitted it was probably a word processing error and withdrew Request 12.  Counsel for Lufthansa have on at least three different occasions since, then insisted renewed their demands for Request 12, and each time I have reminded them that they have already withdrawn it.

(2019 Case, Dkt. 100-5 at ¶ 10.)  Indeed, in its case-ending motion, Lufthansa sought to compel Thales to respond to Request Twelve "to the extent not duplicative."  (Id., Dkt. 100 at 38.)  Lufthansa neither told the Court that it had withdrawn Request Twelve nor conceded that any identified portion was duplicative.

Again, Lufthansa's attorneys could have drafted a proposed subpoena with a limited scope to avoid substantially duplicating the already-litigated 2019 subpoena.  They did not do that.  For all these reasons, the undersigned Magistrate Judge recommends that the District Court exercise its discretion to DENY the Application.  That denial should be without prejudice to the Court's consideration of any future § 1782 application(s) drafted with clearly defined terms to avoid re-

subpoenaing documents subpoenaed in 2019 and minimize the need for extensive negotiations or judicial intervention to target new information actually relevant to Lufthansa's damages.

/ / /

/ / /

## V.
## CONCLUSION

IT IS THEREFORE RECOMMENDED that the District Court issue an Order: (1) approving and accepting this R&R; and (2) denying Lufthansa's Application (Dkt. 1).

DATED: March 31, 2023

_____
KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE